## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SHEILA LAPHAM,

      Plaintiff,

v.                                       Case No: 8:19-cv-02016-CEH-AAS

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

      Defendant.
_____/

# O R D E R

This cause comes before the Court upon Plaintiff's Motion for Summary Judgment (Doc. 35), and Defendant Government Employees Insurance Company's Motion for Final Summary Judgment (Doc. 39). Each party has responded and replied (Docs. 42, 43, 44, 45). The Court held oral argument on the motions on February 12, 2021 (Doc. 58). The Court, having considered the parties' submissions and being fully advised in the premises, will grant Defendant Government Employees Insurance Company's Motion for Final Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## I.    BACKGROUND

### A. Undisputed Facts[1]

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Amended Stipulation of Agreed Material Facts Regarding the Parties' Motions for Summary Judgment.

In January of 2005, Sheila Lapham ("Plaintiff") and her husband, Mark Lapham (collectively, the "Laphams"), completed and signed a Government Employees Insurance Company ("GEICO") application for a personal umbrella insurance policy in New Jersey.[2] Doc. 47 ¶2. This application referenced the Laphams' home address as "9 E. Edgewood Ave., Linwood, NJ." *Id.* GEICO thereafter issued personal umbrella policy number P6017036 to the Laphams in New Jersey, which did not contain uninsured motorist ("UM") coverage. *Id.* at ¶3. The policy was renewed annually, with the last renewal encompassing the policy period from January 14, 2016 to January 14, 2017. *Id.* at ¶5. The policy named the Laphams as the insureds and contained a limit of liability in the amount of $1,000,000. Doc. 34-3 at 4. The policy, which provided that "insurance is provided with respect to the following coverages and limits specified where a premium is stated," listed a premium for a "2014 Toyota," with the minimum required limits of primary insurance listed as "$300,000/$300,000/$100,000." *Id.*

The Laphams permanently relocated to Kissimmee, Florida in August of 2016. Doc. 47 ¶6. According to GEICO's customer service policy log (the "P-Log"), GEICO received a change-of-address notice from the United States Postal Service on August 16, 2016. *Id.* at ¶7. Further, during the time of the Laphams' permanent relocation to Florida, Mark Lapham contacted GEICO on the Laphams' behalf and advised of their relocation. *Id.* at ¶6. The P-Log indicates that, on August 17, 2016, Mark Lapham

---

[2] Plaintiff was married to Mark Lapham at all times material to this action. Doc. 47 at ¶1.

spoke with GEICO to transfer personal automobile and umbrella coverages to Florida *Id.* at ¶8. Mark Lapham received identification cards from GEICO through e-mail initiated with GEICO representative J. Morris, and he spoke with Laura Licul ("Licul"), a customer service agent working in GEICO's umbrella department. *Id.*

Indeed, a P-log entry at 12:58 p.m. on August 17, 2016, indicates that representative J. Morris e-mailed identification cards to the Laphams, confirming the transfer of their underlying automobile coverage to Florida. *Id.* at ¶10. A P-log entry sixteen minutes later from Licul confirmed the transfer of the umbrella policy from New Jersey to Florida:

```
08/17/2016    01:14 PM    U70LXJ    GPUP: ST TO ST MOVE TO FL. DELETED
                                     FORMER NJ PRIMARY RES. WILL CB WITH DR
                                     LIC #. ADDED CONDO AT 1300 PORTOFINO
                                     THEY RENT IT OUT 2-4 MONTHS OF THE YR
                                     AND IS EMPTY OR THEY USE AS GETAWAY
                                     ONCE IN AWHILE
                                     BY: LLICUL  1115
```

*Id.*

Thus, as a result of the Laphams' relocation, GEICO processed a state-to-state move to Florida for the policy, which became effective on August 18, 2016. *Id.* at ¶9.

GEICO sent the policy packet to the Laphams at their Florida address. *Id.* at ¶12. The initial Florida policy covered the policy period from August 18, 2016 to August 18, 2017. *Id.* GEICO's underwriting records do not contain a Florida personal umbrella policy application completed by Mr. Lapham. *Id.* at ¶11. In providing the umbrella application from 2006 to Plaintiff's counsel, a GEICO representative explained that, upon GEICO's processing of the state-to-state move, GEICO "did not

send a new umbrella application at that time." Doc. 34-7 at 1. The policy declarations contained an "Important Message," which stated that "[t]his policy does not include Uninsured or Underinsured Motorist Coverage unless endorsed above." *Id.* Neither UM coverage nor underinsured motorist coverage was endorsed in the policy. Doc. 47 ¶ 11. The policy, therefore, did not contain umbrella UM coverage. Plaintiff did not make a claim during the August 18, 2016 to August 18, 2017 policy period. *Id.* at ¶14.

On June 28, 2017, GEICO sent a policy renewal packet to Plaintiff, which covered the policy period from August 18, 2017 to August 18, 2018. *Id.* at ¶15. The packet contained a cover letter, an electronic funds transfer notification, a declarations page, policy forms and amendments, and a blank form entitled "GEICO's Personal Umbrella Policy Option Form Florida Uninsured Motorists Coverage (UM)" (the "UM Option Form"). *Id.* The renewal packet made $1,000,000 in UM coverage available to Plaintiff by way of the UM Option Form:

> We offer UM Coverage at a limit of $1,000,000 for your GEICO's [sic] Personal Umbrella policy. UM coverage at a limit of $1,000,000 on your GEICO's [sic] Personal Umbrella policy is excess over the required UM coverage limits of $300,000/$300,000 provided by your underlying policy.

*Id.* at ¶16; Doc. 34-10 at 14.

Thus, the UM Option Form offered UM coverage to the Laphams for the umbrella policy at a limit of $1,000,000. The UM Option Form advised Plaintiff, as a then-current Florida personal umbrella policy policyholder, in relevant part:

> IF YOU ARE A CURRENT FLORIDA PERSONAL UMBRELLA POLICY POLICYHOLDER, this form must be completed, signed and returned only if you wish to change the

4

> UM coverage shown on your policy renewal, select UM coverage if you do not currently carry UM coverage, reject UM coverage, or if you are a current policyholder and you wish to continue carrying UM coverage and we have not previously received an option form from you.

Doc. 47 ¶16.

Plaintiff did not return the form or otherwise request umbrella UM coverage during the 2017-2018 policy period. *Id.* at ¶¶16, 18. Like the initial policy issued to the Laphams in Florida, the renewal policy's declarations contained an "Important Message," which stated that "[t]his policy does not include Uninsured or Underinsured Motorist Coverages unless endorsed above." *Id.* at ¶17. Neither uninsured nor underinsured motorist coverage was endorsed in the policy. *Id.*

Plaintiff was involved in an accident in Polk County, Florida on March 1, 2018 (the "Subject Accident"), which was during the 2017-2018 policy period of the policy. *Id.* at ¶20; Doc. 10 ¶4; Doc. 18 ¶4. The policy listed the Laphams as insureds and provided a limit of liability in the amount of $1,000,000. The policy  indicated that "insurance is provided with respect to the following coverages and limits specified where a premium is stated." *Id.* A premium was stated for a "2014 Toyota," with the minimum required limits of primary insurance stated as "$300,000/300,000/50,000." *Id.* The "2014 Toyota"—a 2014 Toyota Highlander—was involved in the Subject Accident. Doc. 34-4 at 4; Doc. 34-5 at 63:24–25, 64:1–4.

Mark Lapham did not request umbrella UM coverage before the Subject Accident.[3] Doc. 47 ¶19. Plaintiff has never requested umbrella UM coverage from GEICO. *Id.* at ¶18. Following the Subject Accident, Plaintiff sought coverage under her underlying GEICO automobile policy, as well as the umbrella policy. *Id.* at ¶21. GEICO paid Plaintiff's UM claim in full under the automobile policy, which is not at issue in the instant action, but denied Plaintiff's UM claim under the umbrella policy on the basis that the policy did not contain umbrella UM coverage. *Id.* Thereafter, Plaintiff initiated this action to recover excess UM coverage. *Id.* at ¶22.

**B. Procedural History**

In her operative complaint, Plaintiff alleges that when the umbrella policy was issued for delivery to the Laphams in Florida on August 18, 2016, GEICO had not complied with Section 627.727(2), Florida Statutes. Doc. 10 ¶20. As a result of this failure, Plaintiff alleges that, at the time of the Subject Accident, the policy included excess UM coverage in the amount of $1,000,000. *Id.* at ¶21. Plaintiff brings one claim for "uninsured/underinsured motorists breach of contract" against GEICO, alleging that she has asked GEICO to tender $1,000,000 in umbrella UM coverage available under the policy, but GEICO has denied the existence of UM coverage under the

---

[3] Mark Lapham did request umbrella UM coverage under the policy almost one year later through a form dated February 11, 2019, however. (Doc. 42 at ¶19 n.1). GEICO received the signed form on February 18, 2019, amended the policy to include umbrella UM coverage effective February 19, 2019, and charged a premium for this coverage. *Id.* The parties agree that the umbrella UM coverage is not retroactive. *Id.*

policy and refused to tender the $1,000,000 limits to compensate Plaintiff for damages she sustained. *Id.* at ¶¶28–29.

Upon GEICO's unopposed request, the Court bifurcated the issue of whether the umbrella policy provides UM coverage from the issue of liability and damages, instructing the parties to proceed on the coverage issue under the Case Management and Scheduling Order. Doc. 23 at 1; Doc. 26 at 5.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006). Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual

8

dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III.   ANALYSIS

In seeking summary judgment, Plaintiff argues that section 627.727(2), Florida Statutes, required GEICO to make UM coverage available to Plaintiff "in the application" up to the bodily injury liability limits of the umbrella policy, as the policy was issued for delivery to Plaintiff in Florida. Doc. 35 at 5. Plaintiff claims that GEICO's failure to do so rendered that coverage a part of the policy by operation of law. *Id.* Plaintiff's argument relies heavily on the Florida Supreme Court's decision in *Strochak v. Federal Insurance Company*, 717 So. 2d 453 (1998). GEICO, on the other hand, argues that it substantially complied with section 627.727(2) when it made $1,000,000 in umbrella UM coverage available to Plaintiff in June of 2017. Doc. 39 at 5–9. GEICO claims that accepting Plaintiff's argument would result in Plaintiff effectively receiving free umbrella UM coverage forever, after GEICO's substantial compliance with its statutory obligations. *Id.*

The Court will (A) review section 627.727 of the Florida Statutes and (B) analyze *Strochak* and GEICO's failure to provide umbrella UM coverage before (C) examining the argument for substantial compliance and other arguments. For the reasons set forth below, GEICO is entitled to summary judgment.

### A. Section 627.727(2), Florida Statutes

In enacting Florida's UM statute, section 627.727 of the Florida Statutes, the Florida Legislature aimed to provide broad protection for Florida citizens against

9

uninsured motorists. *Travelers Commercial Ins. Co. v. Harrington*, 154 So. 3d 1106, 1110 (Fla. 2014) (quoting *Salas v. Liberty Mut. Fire Ins. Co.*, 272 So. 2d 1, 5 (Fla. 1972)). The Legislature has amended the statute numerous times throughout the decades following its enactment, making particularly significant amendments in the 1980s, leading one Florida court to observe, "The relationship between the UM statute and the Florida Legislature is similar to that between a fragile beach and a hurricane, except the annual storm season in the legislature arrives a few months earlier." *Quirk v. Anthony*, 563 So. 2d 710, 713 (Fla. 2d DCA 1990), *approved and remanded sub nom.*, *Travelers Ins. Co. v. Quirk*, 583 So. 2d 1026 (Fla. 1991). Two subsections of section 627.727(2) are relevant for the Court's present analysis: subsection (1) and subsection (2). The genesis of subsection (2) in its current form stems from the Legislature's substantial amendments to section 627.727 in 1984.[4] *See O'Brien v. State Farm Fire & Casualty Co.*, 999 So. 2d 1081, 1087 (Fla. 1st DCA 2009). At that time, the Legislature "explicitly exempted

---

[4] The Legislature amended subsection (2) as follows:

> (2) (a) The limits of uninsured motorist coverage shall be not less than the limits of bodily injury liability insurance purchased by the named insured, or such lower limit complying with the rating plan of the company as may be selected by the named insured. *The limits set forth in this subsection and the provisions of subsection (1) requiring uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for delivery in this state, shall not apply to any policy which does not provide primary liability insurance which includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle. However, the insurer issuing such policies shall make available as a part of the application, and at the written request of the insured, limits up to the bodily injury liability limits contained in such policies ….*

*O'Brien*, 999 So. 2d at 1087–88 (emphasis and alterations in original).

10

policies which do not provide primary liability insurance for specifically insured motor vehicles from the requirements set forth in subsection (1)." *Id.*

While section 627.727(2) serves as the basis for Plaintiff's claim, section 627.727(1) provides helpful context in the course of the analysis. That subsection provides, in relevant part:

> No motor vehicle liability insurance policy which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom. However, the coverage required under this section is not applicable when, or to the extent that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy.
>
> . . .
>
> Unless an insured, or lessee having the privilege of rejecting uninsured motorist coverage, requests such coverage or requests higher uninsured motorist limits in writing, the coverage or such higher uninsured motorist limits need not be provided in or supplemental to any other policy which renews, extends, changes, supersedes, or replaces an existing policy with the same bodily injury liability limits when an insured or lessee had rejected the coverage.
>
> . . .
>
> The rejection or selection of lower limits shall be made on a form approved by the office.

Fla. Stat. § 627.727(1).

Thus, subsection (1) governs only motor vehicle liability insurance policies that provide "bodily injury liability coverage . . . with respect to any specifically insured or

identified vehicle registered or principally garaged" in Florida. *Id.* UM coverage must be provided "therein or supplemental thereto" these types of policies, but an insured named in the policy may reject this coverage. *Id.* An insured may also select limits of UM coverage lower than his or her bodily injury liability limits. *Id.* "Subsection (1) provides the specific form a written rejection of uninsured motorist coverage (or selection of lower uninsured motorist coverage limits than the bodily injury limits provided in the policy) must take," and, further on in the statute, "establishes a conclusive presumption that an insured who signs the form has made 'an informed, knowing rejection of coverage or election of lower limits on behalf of all insureds.'" *O'Brien*, 999 So. 2d at 1084 (quoting Fla. Stat. § 627.727(1)).

On the other hand, section 627.727(2) provides:

> The limits of uninsured motorist coverage shall be not less than the limits of bodily injury liability insurance purchased by the named insured, or such lower limit complying with the rating plan of the company as may be selected by the named insured. The limits set forth in this subsection, and the provisions of subsection (1) which require uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for delivery in this state, do not apply to any policy which does not provide primary liability insurance that includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle. *However, an insurer issuing such a policy shall make available as a part of the application for such policy, and at the written request of an insured, limits up to the bodily injury liability limits contained in such policy or $1 million, whichever is less.*

Fla. Stat. § 627.727(2) (emphasis added).

"Subsection (2) explicitly provides that the requirements of subsection (1) do not apply to non-primary policies." *O'Brien*, 999 So. 2d at 1084. Subsection (2) applies to umbrella policies, while subsection (1) is inapplicable to umbrella policies. *See Quirk*,

12

583 So. 2d at 1026 ("[W]e agree that [section 627.727(2)] requires an issuer of an umbrella policy to notify an applicant of the availability of UM coverage."); *Tres v. Royal Surplus Lines Ins. Co.*, 705 So. 2d 643, 645 (Fla. 3d DCA 1998) (noting that section 627.727(2) deals with non-primary policies and "differs substantially from section 627.727(1), which deals with primary policies"); *Weesner v. United Servs. Auto. Ass'n*, 711 So. 2d 1192, 1193 (Fla. 5th DCA 1998) (finding subsection (1) "inapplicable to non-primary policies such as the umbrella policy," but finding subsection (2) applicable); *see also Birmingham Fire Ins. Co. of Pa. v. Comcar Indus., Inc.*, 551 F. Supp. 2d 1340, 1343 (M.D. Fla. 2008) (stating than an umbrella policy is "a true excess policy, and thus, it is excess over any primary policies"), *clarified on denial of reconsideration*, No. 8:07-cv-762-T-24MSS, 2008 WL 2370141 (M.D. Fla. June 6, 2008).

Thus, under section 627.727(2), an insurer who issues an excess or umbrella policy must "'make available as a part of the application for such policy, and at the written request of an insured,' uninsured motorist coverage in an amount equal to the bodily injury limits contained in the policy or one million dollars." *O'Brien*, 999 So. 2d at 1083 (quoting Fla. Stat. § 627.727(2)). One Florida court has interpreted the statute as simply requiring an excess or umbrella insurer to offer an opportunity to obtain UM coverage to the insured on the basis that "to make available" serves as a definition for the word "offer." *Nieves v. N. River Ins. Co.*, 49 So. 3d 810, 814 (Fla. 4th DCA 2010); *see Zamora v. Ace Am. Ins. Co.*, 830 F. App'x 296, 298 (11th Cir. 2020) ("Florida courts have interpreted 'make available' in § 627.727(2) as meaning 'to offer,' and we

agree."). Further, the statute does not define "application," but one district judge of this Court recently recognized that "the plain meaning of the word recognizes the importance of timing of the offer of UM coverage by expressly requiring it to be a part of the application for coverage and prior to the purchase and delivery of the umbrella policy." *Rodriguez v. Geico Gen. Ins. Co.*, No. 6:19-cv-1862-PGB-GJK (M.D. Fla.), Doc. 145 at 7 (original emphasis removed) (internal quotation marks omitted).

More broadly, courts have construed the statute as requiring *notification* of the availability of UM coverage to the applicant. For example, in *Travelers Insurance Company v. Quirk*, the Florida Supreme Court held that section 627.727(2) "requires an insurer of an umbrella policy to notify an applicant of the availability of UM coverage." 583 So. 2d at 1029. Similarly, in *Tres v. Royal Surplus Lines Insurance Company*, the Third District Court of Appeal held that "[b]asically it only requires an issuer of a non-primary policy to notify an applicant of the availability of UM coverage." 705 So. 2d at 645. Indeed, the "ultimate intention" of section 627.727(2) is "making known to the insured the availability of non-primary UM coverage" so that the insured can "make a choice." *Id.*

### B. *Strochak* and Failure to Provide Umbrella UM Coverage

In moving for summary judgment, Plaintiff relies on the Florida Supreme Court's decision in *Strochak v. Federal Insurance Company*, 717 So. 2d 453 (1998), to argue that GEICO's failure to offer UM coverage to Plaintiff under section 627.727(2)

operates to render such coverage part of the policy by operation of law. The Court

begins with an overview of *Strochak* before turning to Plaintiff's remaining arguments.

> *i.* Strochak

In *Strochak*, the Eleventh Circuit Court of Appeals certified a question to the

Florida Supreme Court, which reframed the question as follows:

> Whether an excess carrier has a duty to make available the
> uninsured motorists (UM) coverage required by section
> 627.727(2), Florida Statutes (Supp. 1990), to an insured
> under an existing policy on vehicles which had never been
> registered or principally garaged in Florida when any
> vehicle, covered or subsequently added, first becomes
> registered or principally garaged in Florida and when the
> policy is delivered or issued for delivery in Florida.

717 So. 2d at 454.

Rita Strochak suffered injuries when she was struck by a "phantom vehicle" in

1992. *Id.* In 1985, long before the automobile accident, Ms. Strochak's husband

applied for a primary liability policy and an excess liability policy in New Jersey. *Id.*

During the application process in New York, he executed a written rejection of excess

UM coverage. *Id.* The insurer thereafter issued an excess policy, effective June 17,

1985, which covered two residences maintained by the Strochaks: a co-op in New

Jersey, which was listed at the primary residence, and a house located in Florida. *Id.*

The excess policy also covered three vehicles, including the Lincoln automobile

involved in the accident. At the time when the insurer issued the excess policy, none

of the vehicles were registered or principally garaged in Florida; the Lincoln was

registered in New York and principally garaged in New Jersey. *Id.*

Ms. Strochak's husband died in October of 1987. *Id.* Shortly thereafter, Ms. Strochak purchased the Lincoln from the Strochaks' business and had it shipped to Florida. *Id.* In March of 1989, Ms. Strochak registered the Lincoln in Florida. She also obtained a primary automobile liability policy from the insurer for the Lincoln, which listed a Florida address as her address. *Id.*

For the 1989 renewal of the excess policy, although Mr. Strochak had died, the insurer mailed a "Masterpiece" policy addressed to him at the New Jersey residence. *Id.* Included with the policy was a letter that explained the newly created Masterpiece program; the Masterpiece policy sent to Mr. Strochak in 1989 replaced all excess policies held by him. *Id.*

Significantly, in June of 1990, the Lincoln, now registered and principally garaged in Florida, was added to the Masterpiece policy. *Id.* In June of 1992, the Masterpiece policy was renewed, listing the Lincoln as being garaged in Florida. *Id.* In November of 1992, when this renewed Masterpiece policy was in effect, the accident occurred. *Id.* Ms. Strochak sued the insurer, seeking excess UM benefits under the excess policy and claiming entitlement under section 627.727(2). *Id.*

In a plurality opinion, the court first rejected the insurer's argument that Florida law did not apply under Florida's choice of law rules because the policy was executed in New Jersey. *Id.* at 455. The court explained that, unlike another case in which the court found another jurisdiction's law to apply where the insurer was unaware of the insured's move or connection to Florida, the insurer in *Strochak* knew of Ms.

16

Strochak's move and connection in Florida, as the Lincoln was registered in Florida, principally garaged in Florida, and added to the Masterpiece policy in 1990, which contained Florida policy terms and signatures and was sent to Ms. Strochak's Florida address. *Id.* The court also recognized that, when compared to the 1985 policy, the 1990 policy provided different coverage and was issued in the name of a different insured—Ms. Strochak. *Id.* As such, the court concluded that the 1990 Masterpiece, which provided excess liability coverage for the Lincoln, was not the same policy that was issued and delivered in New Jersey in 1985. *Id.* On this basis, the court presumed that the parties bargained for, and were familiar with, Florida law. *Id.*

Turning to the issue of whether section 627.727(2) requires insurers of excess policies to offer excess UM coverage to insureds when a vehicle, covered or subsequently added, first becomes registered or principally garaged in Florida, the court rejected the insurer's argument that, because no application was generated after 1985, it had no obligation to offer excess UM coverage to Ms. Strochak. *Id.* The court held that the duty to offer excess UM coverage was created in June of 1990, "when the excess motor vehicle liability policy was first delivered in Florida and included coverage" for the Lincoln. *Id.* Although an insurer's representative testified that coverages were changed through a worksheet, which represented a departure from pre-Masterpiece policy practice in which the insurer required an application any time a new coverage was requested, the court explained that whether the new coverage for the Lincoln may have been added via a worksheet rather than an application was a "distinction without a difference." *Id.* The court highlighted that, as of June of 1990,

17

the insurer was aware of the location of the risk and "had a duty under the statute to offer [Ms. Strochak] UM coverage in an amount equal to the liability limits of the 1990 Masterpiece excess policy."[5] *Id.* at 455–56. Consequently, the court answered the reframed question in the affirmative. *Id.* at 456. Thus, the *Strochak* court "held that the insurer was required under Florida law to offer excess uninsured motorist benefits in 1990, when it first delivered the new policy covering the car in Florida." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1167 (Fla. 2006).

Plaintiff argues that, like *Strochak*, the duty for GEICO to offer excess UM coverage to Plaintiff was created when "the Florida Umbrella Policy" was first delivered to the Laphams in Florida "and included coverage for the Florida-registered vehicle [Plaintiff] was driving when she was injured in the crash." Doc. 35 at 8. There is no dispute that, upon the Laphams' move to Florida, GEICO "processed" a state-to-state move for the umbrella policy, which GEICO had initially issued to the Laphams in New Jersey, nor is there any dispute that, like *Strochak*, the Laphams did not complete an application upon the processing of this state-to-state move. Indeed, the parties agree that GEICO's underwriting records do not contain a Florida personal umbrella policy application completed by Mr. Lapham, and GEICO's representative confirmed that, upon the processing of the state-to-state move, GEICO "did not send a new umbrella application at that time." Doc. 34-7 at 1.

---

[5] In 1992, the Legislature added "or $1 million, whichever is less" to the end of final sentence of Section 627.727(2). Fla. Stat. § 627.727(2) (Supp. 1992).

As the above analysis of *Strochak* demonstrates, the plurality found that the 1990 Masterpiece policy differed from the policy that had been issued to Mr. Strochak in 1985, for which he had signed a written rejection of UM coverage, because the Masterpiece policy provided a different policy number from the 1985 excess policy, was issued to a different named insured than the 1985 policy, and contained different terms than the 1985 policy. On this basis, the court held that Florida law applied, evaluated the insurer's duty under section 627.727(2), and found that the insurer's duty to offer excess coverage for the Masterpiece policy, which differed from the 1985 policy, was created when the policy was first delivered in Florida and included coverage for the Lincoln automobile involved in the subsequent accident.[6] In such instance, even though there was no "application," the insurer had a duty. Here, as discussed, a state-to-state move was simply "processed" for the policy. In seeking to analogize this action to *Strochak*, Plaintiff does not address whether, following the processing of the state-to-state move, the policy, which was effective from only August 18, 2016 to August 18, 2017, constituted the same policy or a different policy. However, GEICO has not made any argument that Florida law does not apply. The Court therefore does not find *Strochak* to be distinguishable on this basis.

---

[6] Florida's First District Court of Appeal articulated this point in *O'Brien*: "Although the certified question in *Strochak* referred . . . to an insurer's duty under an *existing* excess policy, the plurality concluded that 'the 1990 Masterpiece policy that provided excess liability coverage for the 1984 Lincoln *was not the same policy that was issued and delivered in New Jersey in 1985 . . . .*'" 999 So. 2d at 1086 (emphasis in original).

Regardless, a significant distinction between *Strochak* and this case exists. As GEICO highlights, the insurer in *Strochak* did not make available UM coverage at any time after the excess policy was issued and delivered in Florida. Doc. 39 at 8. Here, the parties agree that GEICO sent a renewal policy packet to Plaintiff on June 28, 2017, which contained the UM Option Form. Doc. 47 ¶¶15–16; Doc. 34-10 at 14. The parties agree that this form made available $1,000,000 in UM coverage to Plaintiff. In the form, GEICO clearly offered "UM Coverage at a limit of $1,000,000 for your GEICO's [sic] Personal Umbrella policy." Doc. 34-10 at 14. The policy also had a limit of liability in the amount of $1,000,000. Although Plaintiff counters that this distinction is insignificant because *Strochak* "does not address whether the insurer made the insured aware of the availability of excess UM coverage," she also supplies a copy of the insurer's answer brief to the Eleventh Circuit to argue that Ms. Strochak received a letter and a "Notice of Uninsured Motorist Options" that "explained the availability of optional excess uninsured motorist coverage." Doc. 43 at 4 (internal quotation marks omitted). GEICO replies that Plaintiff's argument mischaracterizes the timeline of the insurer's UM coverage offers in *Strochak*. Doc. 45 at 2.

Of course, relying on one brief submitted to a court to determine the factual background of a case is problematic, as parties often set forth their own characterizations of the facts in their briefs. The answer brief's factual statement section underscores this point, as the insurer found "it necessary to correct and clarify the statement of facts provided by" Ms. Strochak regarding the policies, given that her initial brief contained factual assertions which were "simply not supported by the

record." Doc. 43-1 at 5. Thus, the answer brief is an unreliable source for determining the facts of *Strochak*. Notwithstanding this unreliability, a review of the answer brief does not support Plaintiff's argument.[7]

## ii. *Effect of Failure to Make UM Coverage Available*

What effect, then, does GEICO's subsequent offer of umbrella UM coverage have on GEICO's purported failure to offer such coverage upon delivery? Plaintiff's response is simple: no effect whatsoever. Plaintiff contends that "[w]here, as here, an excess or umbrella insurer fails to offer uninsured motorist coverage as required by section 627.727(2), the coverage becomes part of the policy by operation of law." Doc. 35 at 8. Plaintiff argues that "GEICO is not entitled to cure its *initial* failure" to comply with section 627.727(2) and "[a]ffect a change in the availability of UM coverage under

---

[7] According to the answer brief, for the 1989-1990 renewals, the insurer made several marketing changes, which included renaming several of its policies as "Masterpiece" policies. Doc. 43-1 at 8. "When a policy was renewed under the Masterpiece name, the named insured received a letter explaining the new name of the policies," and this letter additionally explained "the availability of optional excess uninsured motorists coverage." *Id.* In the context of discussing these renewals, the answer brief represents that Ms. Strochak "received this Notice of Uninsured Motorists Options with her June 17, 1989 renewal." *Id.* No other occasions are mentioned. However, the plurality opinion in *Strochak* noted that the "1989 renewal of the excess policy" was addressed to Mr. Strochak in New Jersey and explained the "newly created Masterpiece program." 717 So. 2d at 454. More importantly, the *Strochak* plurality explained that the excess policy was not delivered in Florida until June of 1990 (and the Lincoln was not added to the Masterpiece policy until June of 1990). *Id.* at 454–55. According to the plurality, the insurer's duty to offer excess UM coverage under section 627.727(2) was created only in June of 1990—long after June of 1989—when the excess motor vehicle liability policy was first delivered to Florida and included coverage for the Lincoln. Thus, any attempt by the insurer in *Strochak* to offer UM coverage in June of 1989, prior to the creation of the duty under Florida law, is distinguishable from the instant action. Finally, although the answer brief represents that Ms. Strochak "admitted that she was aware at least since the time that she purchased the car rental business in 1992 of the purpose and nature of uninsured motorists coverage," this assertion does not indicate that Ms. Strochak was aware of an excess or umbrella insurer's duty under Florida law to offer UM coverage.

the policy as a matter of law by including an option form buried in a subsequent renewal packet." *Id.* at 12 (emphasis added). These arguments fall short.

In seeking to hold GEICO to provide umbrella UM coverage, Plaintiff relies principally on *Ferreiro v. Philadelphia Indemnity Insurance Company*, 816 So. 2d 140 (Fla. 3d DCA 2002). In *Ferreiro*, the appellant purchased an optional "Rental Supplemental Liability Insurance Excess Policy" from the appellee-insurer when she rented an automobile from Budget-Rent-A-Car. *Id.* at 140. The appellant was the insured under the policy, which provided $1,000,000 in limits of liability insurance. *Id.* No UM benefits were made available to the appellant, the policy specifically excluded UM benefits, and the written policy was not provided to the plaintiff. *Id.* at 141. Soon after renting the automobile, the appellant was serious injured in an accident with an uninsured motorist. *Id.* The appellant thereafter brought a declaratory judgment action, claiming the right to UM coverage because of the defendant's violation of 627.727(2). *Id.* The trial court held that the fact that section 627.727(1) did not require Budget, as a self-insured rental company, to offer or provide primary UM coverage on the short term rental negated the obligation of the carrier under section 627.727(2) to offer that coverage. *Id.*

The Third District Court of Appeal reversed, finding that the lack of such a requirement under 627.727(1) to offer or provide UM coverage on the short term rental "ha[d] nothing to do with" the carrier's obligation under section 627.727(2) to offer that coverage. *Id.* The court articulated that "excess coverage may arise by statutory requirement, even when no underlying or primary UM coverage exists at all," and,

"[i]n any event, the statute provides for no such exception," but requires that the protection be provided, "particularly in view of the often expressed Florida public policy in favor of UM coverage." *Id.* The court also explained:

> Our conclusion is based simply upon the clear requirements of the statute, which apply directly to the present set of facts, and a long, uninterrupted chain of Florida cases which say that the failure of any motor vehicle insurer, specifically included an excess or even an umbrella carrier, to abide by pertinent statutory requirements concerning offers or provisions of UM protection results in its being held to that coverage.

*Id.*

As GEICO points out, unlike the instant action, UM coverage under the excess policy was never made available to the appellant in *Ferreiro*. Doc. 42 at 7. Further, the "long, uninterrupted chain of Florida cases" standing for the proposition that an umbrella carrier's failure to abide by "pertinent statutory requirements concerning offers or provisions of UM protection results in its being held to that coverage" are distinguishable or do not discuss umbrella insurers being held to coverage.[8] Therefore,

---

[8] With the exception of *Glens Falls Insurance Company v. Russell*, none of the cases cited by the *Ferreiro* court involve a subsequent offer of UM coverage to an insured. In *Glens Falls*, the insured loaned his vehicle to the appellees, who were involved in an accident in September of 1983. 527 So. 2d 228, 229 (Fla. 4th DCA 1988). The carrier notified the insured only a few weeks prior to the 1983 accident, which was "several years" after the insured's purchase of his umbrella policy, that "he could obtain uninsured motorist protection within the limits of his umbrella policy and that his $100,000 uninsured motorist policy could be increased." *Id.* On appeal nearly five years later, the Fourth District Court of Appeal held that "[w]ithout proper notification of such offer of UM coverage on the excess policy, an insured is entitled to the liability insurance as uninsured motorist coverage." *Id.* However, in making this conclusion regarding the excess policy, the court cited to section 627.727(1) as it existed prior to the Legislature's 1984 amendments. Significantly, "[a] key amendment to section 627.727 occurred in 1984, when the legislature substantially rewrote subsections (1) and (2), and *for the first time* explicitly exempted policies which do not provide primary liability insurance for

Plaintiff's argument that the Court must find that any failure by GEICO to offer UM coverage under 627.727(2) results in the coverage becoming part of the policy by operation of law is unavailing.

Plaintiff further claims that "GEICO is not entitled to cure its *initial* failure" to comply with section 627.727(2) "and [a]ffect a change in the unavailability of UM coverage under the policy as a matter of law by including an option form buried in a subsequent renewal packet." Doc. 35 at 12 (emphasis added). Plaintiff relies on *Adams v. Aetna Casualty & Surety Company*, 574 So. 2d 1142 (Fla. 1st DCA 1991), for this proposition. GEICO distinguishes *Adams* on the basis that the insurer's obligation in *Adams* differs from GEICO's obligation under section 627.727(2) to "make available" UM coverage to Plaintiff. Doc. 42 at 7–8. The Court agrees with this distinction.

*Adams* involved primary policies and the written rejection requirement under section 627.727(1) before the Legislature's 1984 amendments to section 627.727. As one other court explained, "section 627.727(2), which deals with non-primary policies . . . differs substantially from section 627.727(1), which deals with primary policies as

---

specifically insured motor vehicles from the requirements set forth in subsection (1)." *Nieves*, 49 So. 3d at 813 (emphasis added) (internal quotation marks omitted). The 1984 amendments "limit[ed] the applicability of the written rejection and minimum limit requirements to policies providing primary liability coverage for a motor vehicle." *O'Brien*, 999 So. 2d at 1088 (quoting *Hooper v. Zurich Ins. Co.*, 789 So. 2d 368, 369–70 (Fla. 2d DCA 2001)). "Therefore, such requirements would not apply to excess or umbrella-type policies which may cover specific vehicles . . . ." *Id.* (quoting *Hooper*, 789 So. 2d at 369–70). Thus, the law presently treats umbrella carriers differently from primary carriers and, although *Ferreiro* relies upon the statute following the 1984 amendments, UM coverage under the excess policy was never made available to the appellant.

involved in . . . *Adams* . . ." *Tres*, 705 So. 2d at 645. In *Adams*, the appellant was an insured under two policies of automobile insurance issued to his father: an Aetna policy that insured two automobiles and set forth limits of coverage at $100,000 for bodily injury liability insurance and $10,000/$20,000 for UM/UIM insurance; and a Standard Fire policy that insured the appellant's automobile and included limits of $100,000 for bodily injury liability coverage and $10,000/$20,000 for UM/UIM coverage. 574 So. 2d at 1144. The Aetna policy was issued on November 1, 1978, and renewed annually thereafter, while the Standard Fire policy was issued on May 1, 1981, and also renewed annually thereafter. *Id.* The appellant was struck by a car on May 7, 1983. *Id.* The appellant sued Aetna, asserting a claim for UM/UIM coverage equal to the limits of the liability coverage under each policy and contending that his father, as named insured, did not make an informed and knowing rejection or selection of the UM/UIM limits lower than the liability limits in each policy. *Id.*

The First District Court of Appeal reversed the trial court's directed verdict and remanded for a new trial, finding that disputed material issues of fact concerning the sufficiency of the appellant's father's *rejection* of UM/UIM limits under section 627.727(1) remained for resolution by a jury. *Id.* The court noted that the renewal of the policies in November of 1982 and May of 1983, the last renewals immediately preceding the accident, were governed by the 1982 version of section 627.727(1), but also observed that the Legislature amended section 627.727(1), effective October 1, 1982, to require the rejection of UM/UIM covered in the statute be in writing. *Id.* at 1146. The court explained that when the policies were renewed after October 1, 1982,

25

they became new contracts required to conform to the newly-amended law "and Aetna's obligations and [the appellant's father's] correlative rights regarding statutorily required UM/UIM coverage necessarily became an inherent part of the renewal policy." *Id.* at 1148. Thus, "Aetna could avoid the *statutorily-required* UM/UIM limits in [the appellant's father's] policies *only by obtaining a valid written rejection conforming to the requirements of the statute* at the next renewal of each policy following October 1, 1982 . . . ." *Id.* (emphasis added).

However, the court explained, Aetna "adduced no evidence to prove it even undertook to obtain validly signed written rejections or selections of lower limits" from the appellant's father, but instead proved "only that it had sent appropriate notices of available UM/UIM coverage to [the appellant's father] with the premium notices and that the forms so enclosed for requesting UM/UIM limits higher than those specified on the face of each original policy were not returned" by the appellant's father. *Id.* Critically, the court explained that the brochures did not inform the appellant's father of Aetna's statutory obligation under section 627.727(1) either to obtain a written rejection of the statutorily required UM/UIM coverage or renew the policy with UM/UIM limits coextensive with the liability limits; they merely advised that he could choose to change the UM/UIM limits if he desired. *Id.* at 1148–49. In addressing waiver, the court found that applying the statute to the facts that could be found by a jury and finding waiver "would completely emasculate the obvious statutory scheme." *Id.* at 1153. The court articulated that doing so would authorize an insurer "guilty of unlawfully issuing policies in direct violation of the statute to avoid the consequences

26

dictated by the statutory language through the simple expedient of mailing out brochures such as the ones sent to" the appellant's father. *Id.* Giving this effect to the statute, the court warned, would revert the law as it existed prior to the Legislature's enactment of section 627.727 and "bind an insured to the facial limits of a policy delivered to and accepted by an insured *without objection* to the stated UM limits." *Id.* (emphasis added). Finally, the court concluded that upholding waiver would "prompt the very evil sought to be cured by the amended legislative requirement *of a valid written rejection of statutorily required UM/UIM coverage*." *Id.* (emphasis added).

Therefore, the *Adams* court's holding was grounded in the language of section 627.727(1), prior to the Legislature's 1984 amendments. The case involved primary policies and the holding was tailored to the written rejection requirement under section 627.727(1). In contrast, section 627.727(2) does not currently require an insured to make a written rejection of excess or umbrella UM coverage; it requires only an excess or umbrella carrier to "'make available as part of the application for such policy, and at the written request of an insured,' uninsured motorist coverage in an amount equal to the bodily injury limits contained in the policy or one million dollars." *O'Brien*, 999 So. 2d at 1083 (quoting Fla. Stat. § 627.727(2)). This distinction also separates the brochures in *Adams*, which advised the appellant's father only that he could choose to change his UM/UIM coverage for non-umbrella policies, from the UM Option Form here. The parties do not dispute that this form made $1,000,000 in UM coverage available to Plaintiff or that Plaintiff did not return the form or otherwise request coverage during the 2017-2018 policy period. Plaintiff admits that *Adams* addresses "a

27

different section of 627.727," but asserts, without further support, that "the premise should apply to umbrella coverages as well." Doc. 43 at 13. The Court disagrees. Consequently, Plaintiff's argument that GEICO may not cure an initial failure to comply with section 627.727(2) and affect a change in UM coverage under the policy by providing the UM Option Form fails.[9]

Based on the foregoing analysis, notwithstanding the absence of any genuine issue as to any material fact, Plaintiff has not demonstrated that she is entitled to judgment as a matter of law. Therefore, Plaintiff's Motion for Summary Judgment is due to be denied.

### C. "Substantial Compliance" and Other Arguments

In moving for summary judgment, GEICO argues that it substantially complied with section 627.727(2) by making $1,000,000 in umbrella UM coverage available to Plaintiff with the renewal policy. Doc. 35 at 5–9. GEICO also makes a policy argument that accepting Plaintiff's argument on motion for summary judgment would effectively give Plaintiff free UM coverage forever.  For the reasons articulated below, GEICO's Motion for Final Summary Judgment is due to be granted.

---

[9] Plaintiff also argues that, in accordance with *Adams*, the insurer must establish that the insured gained actual knowledge of his or her statutory rights under § 627.727 and then waived those rights. Doc. 36 at 12. Plaintiff claims that the record lacks any evidence that Plaintiff was aware of the UM Option Form in the renewal packet. *Id.* The *Adams* court stated that, for the insurer to prevail on its waiver defense, it was required to prove that it sent the brochures to the appellant's father in 1983, that the appellant's father gained actual knowledge of his statutory rights under section 627.727 and the insurer's failure to issue the policies in accordance with such requirements, and that he thereafter waived his statutory rights. 574 So. 2d at 1152–53. Here, GEICO does not raise a waiver defense. As such, this argument is unavailing.

Styling its conduct as "substantial compliance" with section 627.727(2), GEICO relies on *Travelers Insurance Company v. Quirk*, 583 So. 2d 1026 (Fla. 1991), to argue that its offer of $1,000,000 in umbrella UM coverage to Plaintiff via the UM Option Form demonstrates substantial compliance with the requirement of section 627.727(2) to notify the applicant regarding the availability of UM coverage. Doc. 35 at 5. In *Quirk*, the Florida Supreme Court reviewed the language of section 627.727(2) and explained that the statute requires an umbrella policy issuer to "notify" the applicant of UM coverage availability. 583 So. 2d at 1029. As articulated in the District Court of Appeal's opinion for that case, the insured's broker did not request UM coverage on behalf of the insured, but filed a written rejection signed by an employee in his office because he believed that the insured did not desire coverage. *Quirk*, 563 So. 2d at 716. The Florida Supreme Court held that the insurer "substantially complied" with the statute's "notice requirement" when the insurer asked that a written form for rejection of UM coverage be executed, which, according to the court, "exceeded the requirements of the statute." *Quirk*, 538 So. 2d at 1029.

*Quirk* is factually distinguishable. Here, Plaintiff did not sign a written rejection requested by GEICO. However, the concept of substantial compliance advances policy considerations that apply to this case.[10] And GEICO invokes a policy

---

[10] GEICO also argues that Plaintiff "was on notice, or reasonably should have been on notice, that the Policy did not contain UM coverage" because "the initial Policy and the renewal Policy declarations" advised that UM coverage was unavailable unless endorsed and UM coverage was not endorsed. Doc. 39 at 7–8. GEICO contends that "Plaintiff could not have reasonably believed to the contrary because the New Jersey policy similarly did not contain

consideration that accepting Plaintiff's argument would operate to provide Plaintiff with free umbrella UM coverage forever.

As previously discussed, the "ultimate intention" of section 627.727(2) is "making known to the insured the availability of non-primary UM coverage" so that the insured "can make a choice." *Tres*, 705 So. 2d at 645. "[B]asically it only requires an issuer of a non-primary policy to notify an applicant of the availability of UM coverage." *Id.* Under *Strochak*, the duty to offer UM coverage under section 627.727(2) is created when the umbrella policy is first delivered in Florida and provides coverage for a motor vehicle registered or principally garaged in Florida. Assuming the policy is a new policy (Plaintiff presumably would not argue otherwise, given the holding in *Strochak*) and Florida law applies (there has been no contention to the contrary), *Strochak* makes clear that this principle stands in the absence of an "application."

Reviewing the specific facts here, the parties agree that the Laphams relocated to Florida in 2016, and Plaintiff offers an entry from the P-Log stating "DMVR FL" for the 2014 Toyota to demonstrate GEICO's verification with the Florida DMV, which GEICO does not challenge or dispute. Doc. 34-4 at 7; Doc. 35 at 4. As such, a reasonable inference to draw is that the 2014 Toyota was registered or principally garaged in Florida. Thus, under *Strochak*, this duty arose for GEICO upon the delivery of the policy to the Laphams in Florida following the processing of the state-to-state transfer.

---

umbrella UM coverage." *Id.* However, this strays from the requirements of section 627.727(2) by focusing on notice of the unavailability of coverage.

However, unlike *Strochak*, in which there was not a subsequent offer of UM coverage, GEICO made available UM coverage to Plaintiff less than a year after the delivery of the umbrella policy to the Laphams in Florida and long before the Subject Accident. Although GEICO did not make available UM coverage during the initial policy period of the policy upon delivery, it made the coverage available upon the renewal of the policy and prior to the commencement of the next policy period, during which time the Subject Accident occurred. Indeed, the UM Option Form made the availability of non-primary UM coverage known to Plaintiff so that she could make a choice. Specifically, the UM Option Form required Plaintiff, as a current Florida personal umbrella policy policyholder, to complete, sign, and return the form only if she: (1) desired to change the UM coverage shown on the policy renewal; (2) select UM coverage, if she did not currently carry UM coverage; (3) reject UM coverage; or (4) if she was a current policyholder and desired to continue carrying UM coverage and GEICO had not previously received an option form.[11] The UM Option Form

---

[11] Neither party has submitted any proposed interpretation of the UM Option Form's use of "reject UM coverage." Doc. 34-10 at 14. Although Plaintiff argues that the policy provides coverage by operation of law as a result of GEICO's failure to make UM coverage available to Plaintiff at the time of delivery, the parties agree that the policy, as it existed from the August 18, 2016 to August 18, 2017 policy period, did not contain an endorsement of UM coverage, and Plaintiff has not made any argument that GEICO should be held to provide the UM coverage as a result of Plaintiff's failure to return the form. Indeed, the only argument that Plaintiff makes regarding the language of the UM Option Form is a speculative one which focuses on receipt of UM coverage, in which Plaintiff asserts that the form "*would seem* to require the insured to fill out and complete the form even if [the insured] requested UM [coverage] at the time of purchase," thereby leading Plaintiff to claim that "GEICO's mode of operation makes it doubly hard for the insured to *receive* umbrella UM required to be offered by the statute." Doc. 44 at 8 (emphasis added). Plaintiff further asserts that "GEICO *would seem* to employ a two-step process that makes it less likely the insured will take the steps

clearly offered UM coverage at a limit of $1,000,000 for the umbrella policy. It is undisputed that Plaintiff did not return the form or otherwise request umbrella UM coverage. As such, GEICO made available the UM coverage to Plaintiff so that she could make a choice. She did not elect to obtain UM coverage. Consequently, the umbrella policy during the August 18, 2017 to August 18, 2018 policy period did not provide UM coverage.  The Subject Accident occurred during this August 2017 – August 2018 policy period.

But Plaintiff seeks to take this failure to make umbrella UM coverage available to her upon the policy's initial delivery to the Laphams in Florida to override GEICO's subsequent offer of such coverage for the operative policy period, during which time the Subject Accident occurred. Indeed, the facts unique to this case differ from a scenario in which the Subject Accident occurs after GEICO's failure to make available UM coverage upon delivery of the umbrella policy, but before any subsequent offer of such coverage. In such an instance, Plaintiff would not have been entitled to any UM benefits under the umbrella policy as a result of *GEICO's* failure to notify her of the availability of that coverage, not as a result of *her* election. Section 627.727(2) seeks to prevent this type of harm by requiring issuers of umbrella policies to ensure that the insured is aware of "the availability of non-primary UM coverage" so that the insured "can make a choice." *Tres*, 705 So. 2d at 645. Section 627.727 does not treat issuers of umbrella policies the same as issuers of non-umbrella policies. Section 627.727(2) does

necessary to *receive* umbrella UM coverage," but does not cogently tie this assertion to the facts of the case. *Id.* (emphasis added).

not contain the same requirements as section 627.727(1). The subsections "differ[]
substantially." *Tres*, 705 So. 2d at 645. Florida law does not require an excess or
umbrella liability insurer to provide UM coverage, but instead simply requires such an
insurer "at least to inform its insureds of that option." *State Farm Fire & Casualty Co. v.
Walker*, No. 16-14043-CIV-ROSENBERG/LYNCH, 2017 WL 962492, at *2 (S.D.
Fla. Feb. 28, 2017), *aff'd*, 749 F. App'x 839 (11th Cir. 2018).  It is undisputed that
GEICO made known to Plaintiff, the insured, the availability of non-primary UM
coverage at the time of renewal of her policy and before the Subject Accident.

The Court is cognizant that "section 627.727 is to be broadly and liberally
construed," *Nieves*, 49 So. 3d at 813, and of the "public policy in favor of UM
coverage," *Ferreiro*, 816 So. 2d at 141, but finding that the umbrella policy here
provides UM coverage as a result of GEICO's failure to make such coverage available
upon delivery, notwithstanding GEICO's subsequent offer, would run counter to the
purpose of section 627.727(2) and establish a rule granting free UM coverage under an
*umbrella policy* to an insured after an insurer's notification of available UM coverage to
the insured. The Court declines the invitation to reach this result.

When resolving all inferences against GEICO, the arguments raised and the
cases provided by Plaintiff do not defeat the argument that affording UM coverage
here would result in affording free UM coverage under an umbrella policy to an
insured after an insurer's notification of available UM coverage to the insured. Plaintiff
reiterates that, under *Ferreiro*, the policy must be construed as providing UM coverage
as a result of GEICO's failure to provide UM coverage to Plaintiff upon the initial

33

delivery of the policy to the Laphams at their Florida address. Doc. 43 at 5–6. However, as already discussed, *Ferreiro,* and the line of cases cited therein, is distinguishable. Plaintiff also reiterates that, under *Adams*, GEICO is not entitled to cure its initial failure to comply with section 627.727(2) and affect a change in the availability of UM coverage in the policy by including the UM Option Form in the renewal packet. *Id.* at 12–13. The Court previously rejected this argument.

Additionally, Plaintiff appears to argue in passing that the renewal packet provided insufficient notice. For example, she argues that the cover letter of the renewal packet did not disclose the availability of UM coverage or "GEICO's failure to comply with § 627.727(2) by not making umbrella UM available as part of the original policy application." *Id.* at 7. She also claims that the "Important Messages" endorsement page of the policy did not inform Plaintiff that "'this policy does not have UM coverage,'" but instead included "a cryptic statement that the policy 'does not include Uninsured or Uninsured Motorist Coverages unless endorsed above.'" *Id.* at 8. These arguments ignore the UM Option Form and are otherwise unpersuasive.[12]

Therefore, based on the foregoing analysis and the distinctive facts of this case, there is no genuine issue as to any material fact and GEICO, as the moving party, is entitled to judgment as a matter of law.

---

[12] Plaintiff's provision of an application form "apparently in use" by GEICO "since 2006" to argue that the form "does not contain the offer of UM coverage required by the statute" and that "GEICO's regular business practice ignores the plain requirements of section 627.727(2) by failing to include and offer UM coverage in the policy application" is also unpersuasive. Doc. 43 at 8.

## IV.   CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.  Defendant Government Employees Insurance Company's Motion for Final Summary Judgment (Doc. 39) is **GRANTED**.

2.  Plaintiff's Motion for Summary Judgment (Doc. 35) is **DENIED**.

3.   The Clerk is directed to enter **JUDGMENT** in favor of Defendant Government Employees Insurance Company and against Plaintiff Sheila Lapham.

4.  The Clerk is further directed to terminate all pending motions and close this case.

**DONE AND ORDERED** in Tampa, Florida on March 31, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any